Mr. LeRoy. Good afternoon, Your Honors. May it please the Court, I'm here on behalf of the appellant in CrossApply, Ancora, and the inventor of the patent suit, Mr. Mueller, who is with us here today. This case arises out of the District Court. We have one claim, one independent claim, which was asserted, Claim 1. At the District Court, we had six terms which we disputed the construction of and, of course, appealing one term, the term program. The District Court, in its Claim Construction Order, determined that the claim term program refers to an application software at the exclusion of an operating system. So that's really the issue we're here today to talk about, whether the claim term program can capture an operating system. Can I ask you a question that I'm not sure is specifically the question that is raised by the question of program? Do you agree, concede, I'm not quite sure what the right term is, that a computer program that practices your method must run on top of the operating system? Not the programs that it's verifying, but your method itself. So I understand the question and the context in which it arises, and the answer is no, we do not agree with that statement. And I can address that right now if you'd like me to. Well, I guess I'm interested in that, just to lay out what I'm thinking. It seems to me that the prosecution history lends quite a lot of support to that view. It doesn't seem to me to be quite the question of program here. Let me ask you this. Suppose that view were right, do you still have an infringement case? I'd have to think about that. But that would be for remand in any case, assuming you're right about program. Unfortunately, it's not an easy question to answer, the way computers work and the different levels of software that are at issue. So I can't give an answer definitively, because there are different parts of the software in the Apple Q system that work differently. But if I can address the issue, because to be fair, we've addressed the specification, the claims in the briefing, it is what it is. But I would like to address this file history remark, because that appears to be the elephant in the room. There was a couple of different remarks. There was your remarks, and then there was the examiner's statement, which focused a little bit differently. He said something that has a little bit of flavor that the program whose identity is being verified might have to be running on top of the operating system. I don't think you did. So let me put this into context. You're correct. There are two pages, and for everyone's reference, it's page 292 through 294. That's where the applicant is making remarks, traversing an obviousness rejection. Then that's followed immediately by notice of allowance and reasons for allowance, in which the examiner had a different statement, and I would like to explain to you how they're very consistent when read in context. I respectfully suggest this is where the district court went off. I understand if you read us one sentence from the applicant's remarks out of context, it makes it appear as though the invention that performs the method steps, not necessarily the program to be verified, but the method steps themselves are an application. And that statement was made. I can't change that. So the method steps are an application? So the claimed invention is an application? The applicant took the position that the steps that perform the claimed method steps is a software license management application. That's a true statement. But we have to understand the context in which that was made. If you start with the applicant's remarks, the applicant identifies two worlds with respect to the prior art. We have BIOS-level programs, which is code executed in firmware or computer hardware. Then we have operating system-level programs. And one piece of prior art, the eWorks reference, which is an Intel patent, that was a BIOS-level program. I'm sorry, could you define what you understand OS-level program to mean? I just want to make sure we... Not BIOS-level. That's why the remarks about application or program... Okay, I'm sorry. When you say not BIOS-level, do you mean it's running on the operating system? No, it's... OS-level? So you need the OS to be running in order to have an OS-level program to be working? No? Well, it's our position that an OS-level program, which the examiner and the applicant said can be verified by this, includes an operating system. But to answer your question, OS-level program is a software that operates above the BIOS-level. The BIOS-level is down in hardware. And in the remarks, specifically the applicant's remarks, he talked about the BIOS-level programs in the prior art, which operate, execute in hardware, and then operating system-level programs, which sit on top of that. The applicant was not distinguishing what ordinary people consider applications like Microsoft or Word or Excel, which you would click on in your ordinary experience. He's creating, the applicant's defining these two categories of prior art, BIOS-level and operating system-level at the top. Now, there was a remark in the context of that where he said, software license management applications such as the present invention are operating system-level programs. Not excluding operating systems, but embracing them. And the examiner's reason for allowance doesn't even mention the word application. He says, this invention, just like the patent does, just like claim one, just like the summary, he says, this invention is about a method for verifying a computer program running at the OS-level. He says, more specifically, the closest prior art, singly or collectively, do not teach licensed programs running at the OS-level. I'm at A302. The district court's construction, excluding an operating system from the scope of the program to be verified, is exactly the opposite of what the patent examiner said was the reasons for allowance. Well, I think this, I understood Judge Chen's question to reflect a, it was a question about an ambiguity in the phrase operating system-level or OS-level. I would think that there are two possible meanings of that. One is at the same level as the OS, and therefore not calling on the OS. And then the other meaning is at a level that calls on the OS, like regular application. Are those the two choices, and if so, which is the meaning that is used here? Yeah, those are probably the two choices. The second being sort of the lay understanding, and the first being what I would consider to be the accurate understanding based on the record, that the OS-level is software operating at the operating system-level, as distinguished from the BIOS-level. Is there something in the record you can point to that can give me comfort in believing that it's Judge Taranoff's first theory and not Judge Taranoff's second theory on what OS-level program means? Sure. So A302, we have the examiner's reason for allowance. It's a sentence, I'll read it. However, and this is the patent examiner characterizing the invention in the context of the prior art. He says, the key distinction between the present invention and the closest prior art is that MISRA and Ginter systems and the eWords system run at the operating system-level and BIOS-level, respectively. So we've got MISRA, it's a Microsoft patent prior art. We've got eWords, it's an Intel patent prior art. The examiner says, MISRA runs at the operating system-level, and eWords runs at the BIOS-level. These are algorithms for doing different things, but where they're running in the computer is what's at issue here. And the applicant came back with an invention, which was something at the operating system-level communicating with BIOS, which hadn't happened before. It's not about our ordinary understanding of applications. I'm sorry, I thought at some point in your response to the obviousness rejection, you were distinguishing MISRA, and you were talking about how MISRA is dealing with application data and in a license authentication process. That's right. MISRA is talking about application. Actually, MISRA discloses both. We quote in the brief, MISRA expressly states that a program, including the program to be verified, include both application software and operating system software. So we couldn't have distinguished MISRA if we wanted to. There's a paragraph we quoted in our brief. It says, it's at A1420, column 5, line 63 to 67. MISRA discloses both. Now, what MISRA lacked, just to put this in context, the invention is verifying a computer program using data stored in the BIOS. MISRA did verify computer programs, operating systems, applications, but the verifying data wasn't stored in BIOS. That's how we got around MISRA. Listen, I've got to be fair. Before your time expires, could you comment on the, to me rather, telling point that the specification seems to use program and application program interchangeably? Sure. So I'll start by saying we don't agree with that. In fact, I think the applicant went out of his way to expressly and consistently state that the invention in its broadest aspect, and I'm quoting, A45, column 2 of the patent, toward the bottom of column 2. In its broadest aspect, the invention provides for a method of restricting software operation, and it goes on to capture claim 1. At the beginning of the summary invention, the first sentence of the summary invention states, the present invention relates to a method of restricting software. Now, in the use of the term program is used 5 to 1 for the term application, and that isn't necessarily substantive. It's quantitative. But the term application is only used three times, and every time it's used, it is specifically and expressly identified as an example. The spec says, now I'm reading column 2, line 60. The example above, which references this Lotus 1, 2, 3 example, is, quote, given for clarity of explanation only and is by no means binding, close quote. I draft patent applications. I can't imagine what I would do to more, other than specifically say an operating system is a program, what I would do to say to the world, this is an example. It is not binding. Every time the term application is used, it is expressly identified as an example. Also, the details that Apple would like to read into this term, application program, they show up in the claims. They show up in independent claim 18. Independent claim 18 doesn't say program. It says application software program. The inventor, the applicant, the lawyer, and the patent office knew that you've got two categories of subject matter here, program, unmodified by application, and application software program. You're into your rebuttal time. Do you want to use all that? I'll hang on to my time. Thank you very much. Okay. Thank you, Mr. LeRoy. Ms. Maynard? Yeah, please record. I have to take three minutes for our cross-appeal. I'd first like to address program and then turn to our cross-appeal. The District Court correctly construed program in the context of this patent. Program is a word that must be considered in context. And this patent repeatedly, consistently, and interchangeably uses program, application program, software program to mean application. And nowhere discloses or teaches using the verification program to check an operating system. In fact, in column two, it suggests that the verifying application itself is a priori running. So the operating system is already running. Why are those two things inconsistent? Why couldn't you have this verification program? It starts after the operating system is up. And the first thing it does is it checks the operating system and shuts it down if it doesn't belong on that computer. There's nothing in the patent that teaches that's what's happening, Judge Toronto. And if I could point you to column two, to the language the patent suggests otherwise, it's starting at the key part starting at line 12 in column two, which is on A45. Thus, when a program is loaded into the memory of the computer, a so-called license verifier application that is a priori running in the computer accesses the program under question and retrieves there from the license record. So the program under question there is the program being checked. The a priori is already running. The operating system is up. These are applications. What in the claim prescribes that sequence? Well, the claim... Maybe the answer is nothing, but do you think the sequence is implied? But is there some language in the claim that says the verification program has to be up and running before the program it is verifying starts? Well, I think the important point is because we're trying to interpret program that regardless of the order, the specification, the way that it describes its invention is that the invention is up and running before it starts to verify the program. And consistently through here, Judge Tronco, so also if I could point out, this is the summary of the invention. The summary of the invention repeatedly talks only about application programs except for the first sentence and the last. That's true, but at the same time, all the references to the word application in the summary of the invention are cabined by making it clear that it's a specific non-limiting example. For example, column 1, line 45, it says, there follows a specific non-limiting example. And then there's a whole column and a half of a detailed example. And then at the very end of that long detailed example, at the bottom of column 2, line 60, the example above is given for clarity of explanation only and is by no means binding. And then it follows with, in its broadest aspect, this invention provides for a method of restricting software. But the entire summary of the invention, which this court has said is where you look to find the present invention, is described in terms of an application. So to be sure, that language would protect them from other kinds of applications than the one described here, but there's nothing in the patent suggesting that that boilerplate language is getting them an operating system. And to the contrary, in the third paragraph of Summary of the Invention, at line 53, further, according to the invention, each application program that is to be licensed to run on a specified computer. So each application program, according to the invention. So this is the invention language in the Summary of the Invention talking about each application program. And then later in that sentence, it uses the word program to mean application program. It uses program phonetically with application program. Talk to me about the relationship between Claim 1 and 18. Yes, Your Honor. So Claim 18 uses different words. But Claim 18 is an independent claim. And the doctrine of claim differentiation either doesn't apply at all or applies with very little force when you're talking about two independent claims. Especially as here, where the second claim would not be rendered redundant. By reading here, if you look at Claim 18, which is... So your point is two independent claims are each describing the same invention using different words so we can assume application in one and program in the other are describing the same thing? I agree with the last part. We can assume they're using the same word to describe program. The point I was making about Claim 18 is that it has other distinctions from the other claims. So one need not read a difference in the word program and software application program in order to make them cover different scopes. So in Column 8, and we point these out in our brief, but in Column 8 on A48, the extracting, starting at line 40, the extracting license information, the storing and encrypting license information, those three limitations from extracting, encrypting, storing, all of those, none of those are claimed in the claims that depend from one. And they serve to distinguish this claim. And this Court has said often that inventors use the same words to essentially claim the same thing. And that's bolstered by the fact that there's absolutely nothing in the rest of the written description that suggests anything broader than a verification of application. Can I raise a topic that I raised with Mr. LeRoy? Put aside the question of what the to-be-verified program has to be, what is the status, either in this current appeal or on a possible remand, should we agree with him about that, of any intention that the verification software itself has to run through the operating system? I can't answer as to what would happen on a remand, but I think that as the District Court correctly construed both the specification and the prosecution history, it's clear that the invention runs on top of an already operating system and teaches nothing about how such an invention would check the operating system on which it's run. Right, so I guess I'm interested in that because it seems to me that there was a fair bit of support. I don't want to get to a conclusion here, but a fair bit of support for that in the prosecution history discussion, and I'm wondering, was that a distinct basis for either a proposed claim construction, in this case already, a distinct basis for a non-infringement argument? Is that still available? Those are the questions. Well, the District Court looks to that fact as part of its rationale for adopting the program, and we point to that fact as well. We think that bolsters the definition of program. I would have to consult with my colleagues about the status of the infringement contentions at this point on it. Is there an already understood understanding in Claim 1 of what an agent is? An agent is set up a verification structure? All I can tell you is that on this record it wasn't one of the six terms that were construed. Because every juror would know immediately what that means? I can't answer why that's so, Judge Toronto. I do think that to the extent anyone has any doubts about what the patent reads, by just from looking at the patent, the prosecution history confirms that their invention is limited to application programs. Yeah, I'm just trying to figure out if an agent is set up a verification structure is in fact the licensed verifier application. I don't know that a point had been taken on that, Judge Chen. That's fine. But I do think that the District Court claim construction is bolstered by the prosecution history, and I'm happy to walk you through that if you'd like, or I'm happy to switch to my cross-appeal if you'd rather hear from me on that. What would be your best item that you would point to in the prosecution history? Is it the examiner's notice of allowance that Judge Toronto took your opposing counsel to? I think... Excuse me, Judge. Yes, is that it? I think it's a combination of A293 and 94 and the notice of allowance. In other words, what's happening on A293 and A294 is that there was a rejection over the prior art which showed identifying the operating system in the bio. And in order to get around that, they said, we're doing something new and novel, and that's the paragraph that starts on H294, moreover. Moreover, the present invention proceeds against conventional wisdom in the art. Using bios to store application data such as that stored in MISRA's local cache for licenses is not obvious. The bios area is not considered a storage area for computer applications. An ordinary skilled artisan would not consider the bios as a storage area to preserve application data. So this is all about applications, applications, applications. And there's nothing in here to suggest that they were claiming running on the OS level. And in fact, they were trying to distinguish themselves from eWords, which did show identifying an operating system in the bios. I'm sorry, go ahead. Just a quick follow-up. Do you agree with your opposing counsel's conception of what OS level means, OS level program? No, OS, and this was, there was a claim, there was a tutorial before the district court judge that informed her decision, and there was an explanation that OS level is, are applications that operate on an operating system. So the operating system is up and running, the OS level applications are above the operating system. They sort of, the stack of, and that. Did she make a ruling on that? Did she make a ruling on that? I think it informs her claim construction ruling, Judge Timm, but there's no, so on page, in her claim construction ruling, in the... This is going to be your Windows manager, your desktop stuff, on which the applications then run to? All the applications that run on your operating system. And so she said, this was on page A18, Incor's argument makes no logical sense, nor does the record support the broad construction it proposes. The 9-4-1 patent teaches verification of programs which cannot function unless the operating system is running. While those programs may then operate at the same level as the operating system, a software license management application such as the 9-4-1 patent cannot function if the operating system is not functional. So putting together the specification and the prosecution history and what she understood from the tutorial, the district judge correctly concluded that they had not claimed verifying operating systems. If I could, before I run out of time, turn to our cross-reveal, because if this court does not affirm the summary judgment of non-infringement, the court should strike these claims as invalid. The claims are inherently inconsistent with the specification. So, to be sure, the words volatile and non-volatile have an ordinary meaning, and we agree with the other side about what that ordinary meaning is. However, the specification in three places identifies hard disks as a volatile memory.  No, Your Honor. Or sometimes it can serve as a secondary RAM. When it serves as a secondary RAM, the experts below agreed, ours and theirs, that the data remained even when the power was removed. And that means a hard disk is a hard disk. It's non-volatile memory. It's always non-volatile memory, regardless of how it's being used. And in the patent, in three places... This is just an example. In two places, Chief Judge Rader, it's the only example given for what volatile memory means. But it's an example. It's not the end-all and be-all. It's an example. Well, this court doesn't read claims to exclude examples, as a general matter. And if one looks on A47, at Claim 1, and tries to figure out, how would someone of skill in the art design around this? So the first... Selecting a program residing in the volatile memory. If I'm going to build a machine using the hard disk, do I... Is that volatile memory? Is that non-volatile memory? And it can't be more clear that... I mean, the one thing we do believe is that volatile memory is supposed to be the opposite of non-volatile memory. Right? Because it's... And so, therefore, presumably exclusive sets. But, nevertheless, hard disk is even three times as an example of volatile memory. And, you know, the inventor admitted that the only way to sort of make sense of those examples in the specification was to excise them. But in Allen Engineering, this court said, we don't rewrite your patents. They could have taken these out, and, in fact, there was a rejection for this very reason, and they left it in. Do you want to say any rebuttal? I would, yes. Thank you. Okay. Thank you, Your Honor. Mr. Leroy. Your Honors, I'll pick up where my opposing counsel left off, which is with this definiteness issue. The hard disk examples were just examples. Their expert admitted it. We quoted their expert's testimony that a hard disk can be used to supplement RAM. There's no dispute in this case that RAM is volatile memory. But if... And the claims don't even recite a hard disk. There's undisputed... The parties, the experts, the judge, all agree. We all agree on what the plain and ordinary meaning is. No one has ever said in this case... Can I just ask you? I mean, the examiner said your usage of volatile here is bizarre. That's right. The examiner made an amendment, I think, to limit it to BIOS stuff. In what way does that eliminate the difficulty of understanding what in the world you guys meant by volatile? The word's still there, right? That's right. Well, what the examiner said is we were using the term to exclude a hard disk. Hard disk is no longer in the claim. What's in the claim is the word BIOS. We overcame the rejection. But why this is not an indefiniteness case is because the examiner said, listen, applicant, you've got the words volatile and non-volatile memory in your claims, and everybody knows what that is. And we know from the all dental versus advantage dental case, the Federal Circuit case we cited in our brief, that if there's ambiguity as to what a claim term means for purposes of definiteness, we have the luxury of a file history. And even if someone took issues with the examples in our spec, what Apple overlooks is all the other examples that describe volatile and non-volatile consistent with its undisputed plain and ordinary meaning. But all dental v. advantage dental says, quote, the public is entitled to know the scope of the claims but must look to both the patent specification and the prosecution history, especially when there is doubt. That's a definiteness case. Just curious, what's your theory then? Is it that we should ignore those references to hard disk in the spec? Or is it this notion that sometimes the hard disk or at least a portion of it can serve as a secondary RAM? Which one is it? On the record, it's the second one because we have testimony from Apple's expert and our experts saying hard disk can supplement RAM. But I prosecute patent applications. And if we're here today to come up with a new body of law that says if there's a mistake in a patent and a written description in an example that that somehow renders a claim under 112-2 indefinite, when no one in this case has ever said they don't understand the claim, we're talking about a word, an unclaimed word, a spec that can be subject to multiple interpretations. Not an unclaimed word. No, the hard disk. The issue Apple raises is whether hard disk could be volatile or non-volatile memory. Well, no, no, that's not quite. I mean, everybody agrees that hard disk at least in its ordinary understanding is volatile. Their argument is that the claim, which still does include the word, it's non-volatile, right, in the claim. When a reader of the patent does what a reader of the patent is supposed to do, which is not stop at the claim but look at the spec, they start scratching their heads. And if they did so, Your Honor, we would respectfully suggest they would consult the file history. If there was ever any doubt, the examiner resolved it. And so we don't think anybody comes away from reading this patent in the context, also in the context of the examples that Apple does not take issue with. There was one passage in your spec which at least raised in my mind a question whether you meant by non-volatile something like non-erasable. That's right. You could write to it but you couldn't erase it. So ROM, read-only memory, is generally writable, not erasable. So memory comes in all shapes and sizes. There's memory that you can write and read. There's memory that's encoded in hardware that you can't really write or read. And then there's something in the middle. And that would make a hard disk volatile. No, not necessarily. You also identified in the spec double EPROM. That's right. Which is, you identified in the spec as non-volatile but it's also erasable. That's right. So whether it's erasable doesn't necessarily define whether it's volatile or non-volatile. The question is when you turn the power off, you turn the power back on, can I get back to the data? Can I go in there and look at the data? With volatile memory, you cannot. When you cycle the power, you can't get to the data. With non-volatile, you can. Like your hard disk and looking at your computer files the next day, you can see that. But may I briefly address some of the issues on the term program? Why don't you give us one thought, your most important thought there, Mr. LeRoy. I'm afraid we've gotten off track because the district court and Apple are focusing on this relationship between an operating system and what a user perceives as an application, something you at your desk might see. That doesn't come up in the patent, in the prior art, in the file history. We're not talking about what starts first and what can run second. Doesn't the operating system have to already be running? There's nowhere in the intrinsic record that says an operating system has to already be running or that the invention sits above or below or to the side. The only question on appeal is whether the program to be verified excludes an operating system. And the patent office and the reasons for allowance said straight up, yes. A program at the operating system level and how that could exclude, we don't understand how that could exclude the operating system itself. Thank you, Mr. LeRoy. Thank you. Ms. Maynard, you have a brief period here. Very briefly, just to go back to Judge Chen's question about the virtual memory and to the extent that they have suggested that there's one place in the patent that might refer to it as virtual memory, that couldn't be the way that it's referred to in the other two places. And so it's just completely confusing, totally confounding. They've never offered, so if I could just explain that point. So in column two, three, I apologize, 846, they're talking about the need for preventing tampering with data residing in volatile memory such as hard disk. That can't be hard disk being used as virtual memory because in their view, there wouldn't be any data to tamper. But Judge Tranter, they've never offered another definition other than the ordinary definition. You can't get the ordinary definition out there. It's too confusing. Claims should be struck as indefinite. Thank you, Ms. Maynard. That finishes our case. Thank you. All rise.